TFWS, INC., t/a Beltway Fine Wine & Spirits, Plaintiff,

v.

William Donald SCHAEFER, et al., Defendants.

No. Civ.S–99–2008.

United States District Court, D. Maryland.

Feb. 4, 2002.

William J. Murphy, Robert T. Shaffer, III, Murphy and Shaffer, Baltimore, MD, for plaintiff.

Steven M. Sullivan, Meredyth Smith Andrus, Office of the Attorney General, J. Joseph Curran, Jr., Office of the Attorney General, J. Joseph Curran, III, Adelberg Rudow Dorf and Hendler LLC, Baltimore, MD, for defendants.

## MEMORANDUM OPINION

SMALKIN, Chief Judge.

TFWS, Inc., a liquor retailer, has alleged that Maryland's statutory scheme regulating liquor prices violates the Sherman Act, 15 U.S.C. § 1 *et seq.* (2001). By Memorandum Opinion dated September 1, 1999, this Court rejected the defendant's Eleventh Amendment defense and its claim of state action immunity, but dismissed the case for failure to state a claim, reasoning that the statutory scheme was a valid exercise of the State's broad powers under the Twenty-first Amendment to regulate the sale of alcoholic beverages. *See 324 Liquor Corp. v. Duffy,* 479 U.S. 335, 346, 107 S.Ct. 720, 93 L.Ed.2d 667 (1987). The plaintiff appealed to the United States Court of Appeals for the Fourth Circuit. *See TFWS, Inc. v. Schaefer,* 242 F.3d 198 (2001). The Fourth Circuit held that the plaintiff's suit was not barred by the Eleventh Amendment, that the challenged provisions of Maryland's liquor regulation scheme created a hybrid restraint of trade, which was a *per se* violation of the Sherman Act, and that the scheme was not protected under the doctrine of state action immunity. *Id.* at 213.

The Fourth Circuit remanded the case, however, for further proceedings on the defendant's Twenty-first Amendment defense and provided instructions as to how this Court should proceed on remand. Specifically, the Court of Appeals explained:

On remand Maryland should be given the opportunity to assert and substantiate its Twenty-first Amendment defense, and TFWS should be permitted to respond. The analysis the district court should undertake in analyzing Maryland's interest and then balancing it against the federal interest is straightforward. First, the court should examine the expressed state interest and the closeness of that interest to those protected by the Twenty-first Amendment. We acknowledge that little analysis is needed on this point. Temperance is the avowed goal of the Maryland regulatory scheme, and the Twenty-first Amendment definitely allows a state to promote temperance. Second, the court should examine whether, and to what extent, the regulatory scheme serves its stated purpose in promoting temperance. Simply put, is the scheme effective? Again, the answer to this question "may ultimately rest upon findings and conclusions having a large factual component." *Miller v. Hedlund,* 813 F.2d 1344, 1352 (9th Cir.1987). Finally, the court should balance the state's interest in temperance (to the extent that interest is actually furthered by the regulatory scheme) against the federal interest in promoting competition under the Sherman Act.

*Id.*

The parties have now presented this Court with fully briefed arguments concerning the defendant's Twenty-first Amendment defense, and both parties have gathered evidence concerning the effectiveness *vel non* of the State's regulatory scheme in promoting temperance. Both parties now move for summary judgment, and the defendant moves to exclude the

testimony of the plaintiff's expert witness, Thomas R. Overstreet, Jr.

Although both parties have submitted cross-motions for summary judgment, this case does not fit the standard mold of summary judgment. Neither party has asserted that the factual issue now in dispute (whether Maryland's statutory scheme promotes temperance) presents an issue that must be decided by a jury, by a bench trial, or otherwise by a *viva voce* proceeding. There is ample evidence accompanying both parties' motions in this case, including the depositions and reports of both parties' experts. Because both parties had a full and complete opportunity to cross-examine each other's witnesses at deposition and to challenge their assertions in arguments supported by evidence, this Court finds itself in the position to make a factual determination without resort to further development of the evidentiary record. Indeed, as both parties have moved for summary judgment, and neither has suggested holding a plenary trial, the Court will proceed to conduct its analysis on remand in light of the parties' motions and the exhibits thereto. In light of the Fourth Circuit's instructions, this Court will analyze only three issues: (1) whether the State's avowed goal of promoting temperance is an interest protected by the Twenty-first Amendment; (2) whether and to what extent the statutory scheme promotes temperance; and (3) whether the State's goal of promoting temperance, as it is furthered by this particular statutory scheme, outweighs the federal interest in promoting competition under the Sherman Act. For the reasons stated *post,* the Court concludes that the State of Maryland's avowed goal of promoting temperance has been substantiated by the evidence and that the State's interest in protecting the health, safety, and morals of its citizens, in this case, outweighs the federal interest in promoting economic competition in the alcoholic beverage industry.

## I. *The State's Avowed Interest and the Twenty-first Amendment*

█ The State's avowed goal of promoting temperance clearly relates to the interests generally protected by the Twenty-first Amendment. *See, e.g., North Dakota v. United States,* 495 U.S. 423, 432, 110 S.Ct. 1986, 109 L.Ed.2d 420 (1990) (finding that North Dakota's regulatory scheme, which was enacted, in part, to promote temperance, was "unquestionably legitimate"); *Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 276, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984) (identifying the state promotion of temperance as a purpose of the Twenty-first Amendment); *TFWS, Inc.,* 242 F.3d at 213 ("[T]he Twenty-first Amendment definitely allows a state to promote temperance."). As indicated by the Fourth Circuit, little analysis is necessary here, and this Court finds as a matter of law that the promotion of temperance is a proper objective under the Twenty-first Amendment.[1]

## II. *The Statutory Scheme's Effectiveness*

In support of the State's temperance argument, the Comptroller has offered the deposition testimony and reports of two experts, Drs. Frank Chaloupka and David

---

1. The plaintiff has devoted a substantial portion of its brief to the argument that Maryland's true purpose in enacting and defending its statutory scheme is the protection of small retailers. The Fourth Circuit, however, has not instructed this Court to attempt to determine whether promoting temperance is the primary purpose of Maryland's regulatory scheme; it has instructed this Court to evaluate only the "avowed purpose" of the regulatory scheme at issue. Moreover, even if one of the purposes of the scheme is to protect small retailers, it is entirely possible that a separate, and perhaps overriding, purpose is to promote moderation in the purchase and consumption of alcohol.

Levy. In the judgment of this Court, and based on a review of their professional, research, and educational experiences in the areas of both antitrust economics and alcohol consumption, these experts are credible and well qualified to offer opinions on the effects of Maryland's price regulation scheme. FED.R.EVID. 702; *see Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

■ Dr. Chaloupka is a Professor of Economics and serves as a Professor in the School of Public Health's Center for Health Services Research at the University of Illinois at Chicago. He has extensive professional and public experience in studying and advising on drug and alcohol related problems. His research has also included studies concerning the effects of price on alcohol consumption. Dr. Chaloupka's report and deposition testimony support the conclusion that "[h]igher prices for alcoholic beverages resulting from state policies that limit competition in the market for alcoholic beverages, such as the Maryland laws at issue in this case," are "effective in reducing alcohol use in that state," whereas "reductions in the prices of alcoholic beverages will lead to increases in alcohol consumption." *Def.'s Ex. 1, Chaloupka Report* ¶ 11. This research "confirms one of the fundamental laws of economics—that of the downward sloping demand curve, which states that as the price of a product rises the quantity demanded of that product falls and that as the price of a product falls, the quantity demanded of the product rises." *Id.* ¶ 16. Dr. Chaloupka opines that when this fundamental principle of economics is applied to the sale of alcohol, "the reduction in the quantity demanded following a price increase is the result of increased cessation among current drinkers, reduced initiation among potential drinkers, reduced relapse among former drinkers, and reductions in

the number of drinks consumed by continuing drinkers." *Id.* Dr. Chaloupka based his findings on a wealth of alcohol-specific research and experience and on fundamental laws of economics, as must be the case to support an expert's opinion under *Kumho Tire Co., supra,* and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

■ Dr. Levy is a tenured Professor of Economics in the Merrick School of Business at the University of Baltimore, who has extensive experience in both antitrust economics and alcohol abuse policy matters. He also is a Senior Research Scientist for the Pacific Institute for Research and Evaluation, where he conducts research on substance abuse issues. Dr. Levy's expert report and testimony support the conclusion that the anti-discrimination provision in section 12–102 and the price filing system pursuant to section 12–103 both result in higher and more stable prices for alcoholic beverages in the State of Maryland than would exist without the regulations. According to Dr. Levy, the anti-discrimination provision leads to higher prices in at least two ways: (1) by depriving a manufacturer or wholesaler of one important form of price competition, *i.e.,* the selective price reduction to a favored, usually larger, retailer, which is used as a means of increasing market share; and (2) by reducing incentive for retailers to conduct promotions and advertising, especially price-based promotions, since the wholesaler or manufacturer is precluded by law from offering a rebate or allowance to reward or spur the higher volume that such a promotion would bring. *Def.'s Opp. to Pl.'s Mot.Summ.J.* at 31–32; *Def.'s Ex. 2, Levy Report* ¶¶ 12–13.

As to section 12–103, Dr. Levy concluded that the price filing requirement tends (1) to reduce the opportunity for price

competition by requiring that each firm maintain its filed price list for a thirty-day period, and (2) to reduce the incentive for price competition by revealing price cuts to competitors, since in the absence of price filing, one of the incentives to a price reduction is the acquisition of new customers during the period before competitors discover the price cut and adjust their prices. *Def.'s Opp. to Pl.'s Mot.Summ.J.* at 32; *Def.'s Ex.* 2, Levy Report ¶¶ 14–15.

Both Drs. Chaloupka and Levy are qualified to offer expert opinions in this matter; the doctors themselves and their research and opinions meet all of the relevant criteria under FED.R.EVID. 702 and the Supreme Court's interpretation of that Rule in *Kumho Tire Co.* and *Daubert*, both *supra.* Moreover, the opinions they offer and the research that support it are specific to antitrust economics and the correlation between Maryland's liquor prices and alcohol consumption. *Id.*

The plaintiff has also offered evidence in the form of expert testimony, which concludes that pricing laws such as Maryland's cannot be proven to promote temperance and, paradoxically, can lead to an overall increase in consumption. The plaintiff's expert is Dr. Thomas R. Overstreet, Jr., a vice president of a major economic consulting firm and a professional economist who specializes in antitrust and industrial organization. He has no prior experience with the alcoholic beverage industry.

The defendant has moved to have Dr. Overstreet's testimony stricken entirely, arguing that he cannot offer an expert opinion under FED.R.EVID. 702. The defendant argues that Dr. Overstreet's lack of experience with the alcoholic beverage industry renders him unable to offer a reliable expert opinion in this matter.

▪ Dr. Overstreet qualifies as an expert economist in this case. Although he has no experience in the alcoholic beverage industry, his testimony as to general economic principles, as applied to the alcoholic beverage industry, is well within his asserted realm of expertise and is helpful. *See Kumho Tire Co.* and *Daubert*, both *supra.*

Although Dr. Overstreet's testimony and report are admissible and have been considered, they lack the persuasiveness of the evidence offered by the defendant, in the form of the expert testimony of Drs. Chaloupka and Levy. The three major points that the plaintiff raises through Dr. Overstreet's testimony are ultimately ineffective in showing that Maryland's scheme does not promote temperance. The plaintiff first argues that because the laws have, as an effect, the protection of small retailers, the scheme "increase[s] the number of retail outlets of alcoholic beverages." *Pl.'s Mot.Summ.J.* at 26; *Pl.'s Ex.* 24, Overstreet Report, ¶ 27. However, as the defendant correctly points out, the State may prevent the multiplication of small retailers through its liquor licensing system, which can serve as a complete barrier to opening new liquor stores. *See* MD.ANN. CODE art. 2B § 10–201 (1998) (granting the Comptroller the discretion to deny applications for licenses to sell alcoholic beverages). Thus the effect of the schemes in protecting small retailers does not diminish the State's goal of temperance.

Next, the plaintiff asserts that the phenomenon of brand— and category-shifting among alcohol consumers nullifies any potential temperance effect that could be furthered by the State's scheme. The plaintiff asserts that, when faced with a price increase, consumers will simply switch to lower priced brands or categories of alcohol, rather than consuming less. The conclusion that consumers will react in this fashion is unsubstantiated by the plaintiff's

evidence, which does not take into account any empirical or even theoretical work on brand or alcohol type (*i.e.*, scotch, bourbon, beer, wine) allegiance. Quite obviously, a drinker who can only abide scotch and does not have a bottomless wallet might prefer to drink less, but more expensive, scotch than more, but cheaper, rye. Moreover, the plaintiff implies that brand— and category-shifting would be most common with the "problem drinkers," who are likely "the focus of the State's temperance program." *Pl.'s Mot.Summ.J.* at 26. There is no indication that the State only meant to prevent "problem drinkers" from continuing their habits. It is far more likely that the laws were intended to promote temperance at all levels, or, in Dr. Chaloupka's words, to promote "increased cessation among current drinkers, reduced initiation among potential drinkers, reduced relapse among former drinkers, and reductions in the number of drinks consumed by continuing drinkers." *Def.'s Ex. 1, Chaloupka Report* ¶ 16.

Finally, the plaintiff uses Dr. Overstreet's testimony to point out that the scheme allows for wider profit margins for wholesalers and manufacturers, who might use the extra money to increase sales through marketing, advertising, and product line extensions, which may lead to an increase in overall consumption. While this is a possibility, it is a remote, speculative, and tolerable one, in light of the direct effect that the scheme has on keeping prices high and the correlation between high prices and lower demand for alcohol, as convincingly substantiated by the defendant's evidence.

Based on the evidence in the record, it is the judgment of this Court that the defendant has adequately substantiated its avowed purpose of preventing undue stimulation of alcohol sales and consumption through regulation of price competition.

### III. *Balancing State and Federal Interests*

Having established that the State's regulatory scheme promotes temperance in Maryland, the next question is whether the State's interest in promoting temperance (and the underlying interests of protecting the health, safety, and morals of its citizens) outweighs the federal interest in promoting unrestricted competition in the alcoholic beverage industry.

State legislation aimed at promoting temperance is historically premised on an undoubtedly legitimate goal:

> The statistics of every state show a greater amount of crime and misery attributable to the use of ardent spirits obtained at . . . retail liquor saloons than to any other source. The sale of such liquors in this way has therefore been, at all times, by the courts of every state considered as the proper subject of legislative regulation. . . . It is a question of public expediency and public morality, and not of federal law. The police power of the state is fully competent to regulate the business, to mitigate its evils, or to suppress it entirely. There is no inherent right in a citizen to thus sell intoxicating liquors by retail. It is not a privilege of a citizen of the state or of a citizen of the United States. As it is a business attended with danger to the community, it may, as already said, be entirely prohibited, or be permitted under such conditions as will limit to the utmost its evils. The manner and extent of regulation rest in the discretion of the governing authority. . . . It is a matter of legislative will only.

*Crowley v. Christensen,* 137 U.S. 86, 91–92, 11 S.Ct. 13, 34 L.Ed. 620 (1890).

Ratified to bring an end to the federal government's spectacularly unsuccessful attempt to enforce temperance, "[t]he Twenty-first Amendment sanctions the

right of a State to legislate concerning intoxicating liquors brought from without, unfettered by the Commerce Clause." *Ziffrin, Inc. v. Reeves*, 308 U.S. 132, 138, 60 S.Ct. 163, 84 L.Ed. 128 (1939). Section 2 of the Amendment "gives the States control over the 'transportation or importation' of liquor into their territories," and "such control logically entails considerable regulatory power not strictly limited to importing and transporting alcohol." *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 107, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) (citing *Ziffrin*, 308 U.S at 138, 60 S.Ct. 163). Drawing on its Twenty-first Amendment powers, "[t]he State may protect her people against evil incident to intoxicants," "may adopt measures to effectuate these inhibitions and exercise full police authority in respect of them," and "may exercise large discretion as to means employed." *Ziffrin*, 308 U.S. at 138–39, 60 S.Ct. 163. Thus, courts give deference to legislative acts passed pursuant to the States' Twenty-first Amendment powers. *See North Dakota v. United States*, 495 U.S. 423, 433, 110 S.Ct. 1986, 109 L.Ed.2d 420 (1990) ("Given the special protection afforded state liquor control policies by the Twenty-first Amendment, they are supported by a strong presumption of validity and should not be set aside lightly."); *id.* at 439–40, 110 S.Ct. 1986 ("[W]hen the Court is asked to set aside a regulation at the core of the State's powers under the Twenty-first Amendment ... it must proceed with particular care."); *Carter v. Virginia*, 321 U.S. 131, 137, 64 S.Ct. 464, 88 L.Ed. 605 (1944) (noting that the State's entitlement to enforce its laws "must be judged in the light of [the Supreme Court's] longstanding recognition of the exceptional problems involved in successfully regulating trade in intoxicating liquors.").

■ In light of the finding that the scheme in effect here actually promotes the State's goal of a more temperate popu-

lation, it is the judgment of this Court that the State's interest in protecting against the myriad and substantial harms associated with alcohol, as noted here and in this Court's first opinion in this case, *see* Memorandum Opinion of Sept. 1, 1999, outweigh the federal interest in unrestricted economic competition in the liquor industry. While the promotion of competition is undoubtedly a valid concern, the protection of citizens from crime, disease, and social deterioration by promoting the responsible and measured consumption of alcohol outweighs the federal interest in ensuring a competitive market economy for alcoholic beverage retailers. *Salus populi suprema lex est.*

### IV. *Conclusion*

For the reasons stated herein, by separate Order, the Defendant's Motion for Summary Judgment will be GRANTED, the Plaintiff's Motion for Summary Judgment will be DENIED, the Defendant's Motion to Exclude the Testimony of Dr. Thomas R. Overstreet, Jr., will be denied, and this case will be CLOSED.